

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DG:SME/GMM/NJM
F. #2017R02001

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 19, 2022

By ECF

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

>  Re:  United States v. John Won
>        Criminal Docket No. 18-184 (RJD)

Dear Judge Dearie:

  The government respectfully submits this letter in connection with the defendant's sentencing, currently scheduled for July 27, 2022, at 11:00 a.m.  The government respectfully submits that a sentence of 24 months, below the applicable United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range, is appropriate in this case.  The government also respectfully requests that the Court order the defendant be jointly and severally liable for payment of $842,076.81 in restitution.  See Presentence Investigation Report dated April 21, 2022 ("PSR") ¶ 97.

I. Background

  As set forth in the PSR, and as proven at trial, in or around and between October 2010 and December 2013, the defendant participated in two overlapping fraud schemes involving foreign exchange ("FX") trading.  PSR ¶¶ 15-25.  Additionally, because the defendant and his co-conspirators washed the proceeds of their crimes through each others' bank accounts and sought to disguise the origins and destinations of their victims' money, he was convicted of money laundering conspiracy.  PSR ¶ 30.

  A. The FX Trading Scheme

  In connection with the first scheme, the defendant and his co-conspirators used advertisements in Korean-language newspapers and on Korean radio to induce Korean-American investors to open FX trading accounts with Kang's company, ForexNPower.  A representative example, which was introduced at trial as Government Exhibit 3-T, is below:



This example, like much of the defendant's company's materials, promised that the company had a "secret method to earn 10% monthly profit[s]" such that you could earn "$100,000 with a

minimum o[f] less than $2000 starting money." The company also advertised "heavily" on at least one Korean radio station. See Tr. 57-58.[1]

       ForexNPower offered seminars to investors at which the co-conspirators repeated these lies in an effort to secure "investments" from their victims. PSR ¶ 16; Tr. 68 (at the seminars, ForexNPower speakers represented, always in Korean, that there was "no risk at all," and that there would be "minimum ten percent or more profit guaranteed"). At the seminars, the defendant "was always in the room assisting Kevin Kang; distributing brochures, sometimes he [would] speak[] on the stage, that kind of thing." Tr. 67. The advertisements and seminars emphasized, among other things, "the experience of [ForexNPower]'s trading staff; (2) the rates of return historically achieved by [the company]; (3) the likely future rates of return . . . (4) the general risks associated with FX trading and (5) an insurance program [the company] purported to maintain, which the coconspirators claimed would pay investors back for any losses they incurred, plus a 10% profit." PSR ¶ 16. The defendant could not have been surprised by these misrepresentations—many were also included on his business card, Government Exhibit 54-T:

Front:

**Forex n Power**
forexnpower.com

*Client Relations Director*
John Won
John@forexnpower.com

217-04 Northern Blvd, Suit 21,
Bayside, NY 11361

Office    718.224.6989
Cell       646.770.7100

---

    [1]    References to "Tr." refer to the trial transcript, and references to "GX" refer to government exhibits introduced at trial.

Back:

> **Forex n Power Forex Trading / Free Seminar**
>
> **Time and Financial Freedom**
> secret method of generating 10% or more monthly profit
>
> - Easy trading method anyone can learn (4 week course)
> - Secret trading method generating more than 10% monthly profit
> - Continuous and systematic management and consulting
> - Maintains safe and high return strategies through a team forum by each class
> - Real training and psychological training through demo accounts
> - Provides trading strategy signals to individual investors
> - Targeting $100,000 with $500 starting money
>
> Basic Concepts Class: Every Wednesday 10am, 7pm (reservation required)
> Forex Trading Specialist Course Training Academy (100% Free Training)

Despite their repeated representations, the co-conspirators had no secret method to generate profits and losses were not only a risk—they were all but guaranteed. See GX 311-16; Tr. 706-20; PSR ¶ 26. The traders were inexperienced and had no expertise in FX trading. PSR ¶ 18. In fact, they were only able to trade in FX at all because the defendant negotiated a deal with licensed FX dealers to enable the company to recruit investors to open accounts through FXCM, a foreign exchange dealer. Tr. 231.

Although the company lost a substantial amount of money for its clients, the company itself made a commission or fee on "every trade conducted by an individual that [it] introduced to . . . FXCM" through an arrangement with FX Evolve, an introducing broker that worked with the defendant. Tr. 391.

B. The Stock Investment Scheme

In a second, related scheme, the defendant and his co-conspirators elicited investments into stock issued by the entities that did business as ForexNPower. PSR ¶¶ 24-26. The co-conspirators represented to stock investors that their funds would be used to trade FX, to open new businesses or to expand the business. Id. Ultimately, however, the investor funds were largely misappropriated by the defendant and Kang. Id. ¶ 24-25; see GX 331 (detailing the pilfering of numerous investments into accounts controlled by the defendant, Kang, and Kang's wife, Sung Mi Kang); Tr. 757-73 (same, and detailing how much of it went to the defendant in particular).

The defendant participated in meetings relating to the stock investment scheme, including at least one in which he stood up after a presentation and shouted, "Who wants to be company shareholder? Please line up." Tr. 122.[2] The defendant translated fraudulent contracts

---

[2] The defendant's attempts to relitigate the witness's credibility, Def. Ltr. at 11 n.3, are not persuasive. The defendant's opportunity to discredit the many witnesses against him was

4

into English.  See GX 1340, 1340-A, 1340-AT, & 65; Tr. 869-71, Helen Kim Depo. Tr. 34-35 (noting that the fraudulent contract which Kang emailed to the defendant in Korean was provided to the victim in English the next day).  The defendant signed fraudulent stock certificates, GX 32, 63, 86, 92, and within days of each investment typically pocketed substantial portions of the alleged investment, GX 331.

The defendant's crimes eliminated the life savings of a daycare provider who earned $300 per week.  Tr. 678.  They cost other victims as much as $60,000.  PSR ¶ 25.  Ten investors in the stock investment scheme alone lost approximately $300,000.  Id.

C. The Defendant's PSR Objections

The defendant filed no timely objections to the PSR, see Fed. R. Crim. P. 32(f), but his sentencing submission raises a number of objections to the PSR, including some objections to the Guidelines calculations discussed in Part II infra and a litany of factual objections, many of which lack support.

For example, the defendant argues that he was the Secretary, and not the Vice President, of Safety Capital Management.  See Def. Ltr. at 2.  But titles and positions at Safety Capital Management were fluid.  See GX 54-T, supra (listing defendant's title as "Client Relations Director" at ForexNPower"); GX 86 (listing defendant as "Secretary" of Safety Capital Management"); GX 430 at 116 (the defendant testified that he was "client relations director" at ForexNPower, which he testified encompassed both Safety Capital Management and GNS Capital); Tr. at 922 (defense witness testifying that he did not have "any clearcut job title" at Safety Capital Management, although he "was an officer"); id. at 929-30 (same witnesses testifying that he "was not clear what [his] title was so [he] wanted to ask Dr. Lee what exactly what [his] title was."

The defendant argues that there was "no evidence" that the defendant "distributed promotional materials about FNP at the seminars."  Def. Ltr. at 2.  But Allen Kim testified that at the seminars, "Mr. John Won was always in the room assisting Kevin Kang, distributing brochures, sometimes he speaks on the stage, that kind of thing."  Tr. 67; see also id. at 60-70 (reiterating that the defendant "handed out some brochures at the seminars" and identifying GX 8 as one of the brochures that the defendant handed out); GX 1221-T (another brochure handed out by the defendant replete with lies about Safety Capital Management).

The defendant was also copied on numerous emails to investors, see GX 1203-T and attachments, including some sent from the info@forexnpower.com email address, from which he occasionally sent emails, see GX 1312, and which he listed as one of his email addresses in his signature, see GX 1343.  The statement that the defendant "and his co-conspirators continued to provide false and misleading information to investors" is thus accurate,

---

trial.  Mr. Kim, like Mr. Chung, Mr. Suh, Ms. Kim and Ms. Choi, were credible witnesses who were victims of the defendant's crimes.

although the government agrees that the defendant did not separately email investors to mislead them about the status of their investments. PSR ¶ 17; cf. Def. Ltr. at 2.

The defendant plainly did lie to FXCM, contrary to his current claims. See Def. Ltr. at 2, PSR ¶ 18. Notably, the defendant represented that (1) GNS was wholly separate from Safety Capital Management and (2) GNS was not holding itself out as a money manager. The defendant set up GNS as a separate company in FXCM's system because Safety Capital Management "ha[d] been terminated," so that GNS could only operate if the defendant was operating "separately" from Kevin Kang. Tr. 247-48; see GX 1106 and GX 1107. But, as the defendant readily concedes, Kevin Kang was still running ForexNPower, which encompassed both Safety Capital Management and GNS, see Def. Ltr. at 11 (arguing that the defendant "was president in name, but not in effect," because Kang still effectively ran the company). The same address and telephone number were used (although the defendant was willing to change them to ensure that the companies appeared sufficiently different to FXCM, see GX 1107). Deric Chen from FXCM testified that Kang was not allowed to be "in control of the company" that was applying for money manager status, and the defendant told him that it was a new company with new employees. Tr. 249-52. The defendant emailed documents reflecting the defendant's control of the new company. GX 1008, 1008-A and 1008-B.

Similarly, when the defendant agreed that GNS was not holding itself out as a money manager and that it would submit its written materials for FXCM's compliance review, GX 2403, that was a lie. It was a lie the defendant repeated. GX 2410. He was aware of the company website, www.forexnpower.com, and of some or all of the numerous radio and newspaper advertisements for the business, GX 430. He knew the company was providing advice to more than 15 people and that it was advertising as a money manager regularly. His denial that those forms constitute lies, at this stage, is frankly puzzling. Moreover, the defendant also lied about his having "successfully acquired a BOT program" that would lead to positive returns. GX 1112.

The defendant's claim that he made no misleading statements to investors is inconsistent with his assertion that he is accepting responsibility and inconsistent with the evidence. He handed out brochures, including GX 1221-T, which contained substantial numbers of misleading statements, including that ForexNPower was "[t]he first licensed IB (Introduce [sic] Broker) registered in the NFA (National Futures Association),"; and that the market had a "misunderstanding that forex investment = Risky Investment goods." The brochure further indicated that a "threat" in the FX market was "[l]osses incurred from individual investors' wrong transaction methods," and noted that "threats can sometimes be used to differentiate oneself." Id. And the defendant encouraged people to invest based on these misrepresentations. Tr. 113.[3]

---

[3] The defendant also argues that "[t]here is no evidence in the record as to what happened to the majority" of the money from checks that he wrote to himself. Def. Ltr. at 2. That is not a correction to the PSR. Similarly, the defendant seeks to insert into the PSR the erroneous defense theory that he was duped into misleading investors by Jason Hoerr and Deric

6

II. The Guidelines

    A. The PSR's Guidelines Calculation

In the PSR, the United States Department of Probation ("Probation") calculated the Guidelines range for the fraud schemes as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1)) | | 7 |
| Plus: | Loss in excess of $500,000 (U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Plus: | 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Defendant was investment adviser (U.S.S.G. § 2B1.1(b)(20)(A)(iii)) | +4 |
| Plus: | Leadership role (U.S.S.G. § 3B1.1(a)) | +2 |
| Plus: | Obstruction of justice (U.S.S.G. § 3C1.1)) | +2 |
| Total: | | 31 |

PSR ¶¶ 36-44. For the money laundering conspiracy, the same calculation applies, except that the defendant receives an additional two-level increase because the offense was a violation of 18 U.S.C. § 1956. PSR ¶¶ 45-50. Accordingly, the offense level used in the PSR is 33, which yields a Guidelines range of 135 to 168 months' imprisonment. PSR ¶ 87.

    B. The Disputed Provisions

The defendant challenges a number of the PSR's Guidelines calculations. Specifically, the defendant challenges (1) the obstruction of justice enhancement, see Def. Ltr. at 3-5; (2) the investment-adviser enhancement, see id. at 5-6, and (3) the leadership role enhancement, see id. at 6. The government will not challenge the defendant's arguments with respect to these enhancements. Although it is unclear, it appears the defendant also challenges the loss amount used to calculate the applicable Guidelines range under Section 2B1.1(b)(2). The PSR's calculation of the loss amount for the Guidelines range is appropriate.

        1. The Government Does Not Seek to Prove that the Defendant Obstructed Justice

The defendant challenges the Probation Office's determination that he lied during a deposition before the Commodities Futures Trading Commission ("CFTC"). The government

---

Chen. Id. The government does not agree with the defense theory, but even if it were true its omission from the PSR is not error.

7

does not seek to prove at sentencing that the defendant lied to the CFTC. Accordingly, these levels may be removed from the defendant's Guidelines calculation.

### 2. The Defendant Was Not an Investment Adviser Pursuant to the Guidelines

The government agrees with the defendant that the defendant was not an investment adviser in relation to the stock investment scheme.[4] To qualify, the defendant would have to have been in the business of advising people about what stocks or other securities to purchase. See U.S.S.G. 2B1.1 App. n. 16(A); 15 U.S.C. § 80b-2(a)(11). Involvement in the instant offense, without more, could not qualify someone as an investment advisor—<u>anyone</u> who encouraged people to buy securities based on false premises, would be subject to the enhancement.

The purpose of the investment adviser enhancement is to punish paid investment advisers who fraudulently steer their trusting customers into investment that inure to the advisors' benefits. That does not describe this defendant, who never provided professional advice regarding securities. Having profited from his efforts to corruptly persuade victims to invest in his company does not make the defendant a paid investment adviser.

### 3. The Government Does Not Argue that the Defendant Supervised His Co-Conspirators

The defendant argues that he was not a leader or organizer of the crimes, because he did not supervise anyone and did not have much contact with the victims of the frauds. The government does not argue that the defendant was a "leader" within the context of this enhancement, although the defendant was higher in the company hierarchy than the other co-conspirators (aside from Kang). The government notes that the defendant was close to Kang, Tr. 340, and that the defendant was given substantially more money from the fraud scheme than other employees of the company, Tr. 776 & GX 333. Although, for the reasons set forth below, the government believes a downward variance to be appropriate, the defendant exercised substantial "management responsibility over the property, assets, or activities of" GNS, a criminal organization, such that "[a]n upward departure may be warranted." U.S.S.G. § 3B1.1 App. n. 2.

### 4. The Loss Amount Is Properly Accounted for in the PSR Guidelines

The defendant also appears to challenge the loss amount calculated by Probation. See Def. Ltr. at 2-3. The defendant's baseless claim that his "adjusted offense level should be decreased by two additional points" because the defendant was not meaningfully involved in Safety Capital Management, id. at 2, should be rejected. His trial defense—that he was duped by

---

[4] The government notes that the defendant mischaracterizes the record in support of his position. See Def. Ltr. at 6 (falsely claiming that "[t]he record is clear that Mr. Won did not advise anyone to purchase stock in Safety Capital"); but see Tr. 114, 122; GX 1221-T.

8

Kang into his role—was soundly and swiftly rejected by the jury. This "mitigation" is an effort to trot out the same logic.

The defendant was involved in Safety Capital Management's fraud just like he was involved in GNS Capital's fraud. For example, when Safety Capital Management represented to FXCM that it did not "hold itself out to the public as a [Commodity Trading Advisor] or money manager" and did not manage accounts for 15 people in the previous 12 months—all lies over Sungmi Kang's signature—the defendant is the one who sent those lies to FXCM. GX 2407.

Irrespective of whether the defendant was involved in creating Safety Capital Management, he was instrumental to the success of its frauds. He signed fraudulent stock certificates, he participated as Kang and others defrauded investors, he read the newspapers and saw the advertisements in which the company of which he was a corporate officer committed fraud on a broad scale. The defendant should be held to account for what Safety Capital Management did.

Finally, even if the loss amount for the FX trading scheme were what the defendant suggests, or $438,569.89, see Def. Ltr. at 3—and it is not—because the loss from that scheme aggregates with the loss from the stock investment scheme, which was $299,677.14, the total loss amount still greatly exceeds $550,000. PSR ¶¶ 29, 51; U.S.S.G. § 3D1.2(d).

C. The Government's Calculation

Accordingly, the government believes that the PSR's calculation should be adopted with the three exceptions listed above. That leads to the following calculation:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. §§ 2X1.1(a) and 2B1.1(a)(1)) | | 7 |
| Plus: | Loss in excess of $500,000 (U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Plus: | 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Total: | | 23 |

With an offense level of 23, the defendant's Guidelines range is 46 to 57 months' imprisonment.

III. Argument

The government respectfully submits that a sentence of 24 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth in 18 U.S.C. § 3553(a).

The defendant's offense, which resulted in losses in excess of $800,000 on the part of a substantial number of victims, was serious. PSR ¶¶ 25-27. The defendant's victims were largely hardworking immigrants, a number of whom made the mistake of trusting the defendant with their life savings and retirement funds. The defendant preyed upon this vulnerable community, taking advantage of the fact that his victims would be more likely to trust

9

someone who spoke to them in Korean, who likely read the same Korean newspapers and listened to the same Korean radio that they did.  The immorality of this conduct merits a substantial punishment.

The defendant's role in the offense was important, notwithstanding his self-serving statements to the contrary.  Although the defendant was second only to Kang in his role in the conspiracy, he appears to argue that the "traders and programmers" who operated ForexNPower's "bots" were somehow more responsible than he was.  Def. Ltr. at 11.  That is not the record.  Because of the defendant's facility with English, the defendant seemed credible and reliable, he was the face of the company to business entities such as FXCM and FX Evolve, without which ForexNPower could not have done business.  Tr. 231, 259, 401.  He reliably submitted false documents to the industry players that enabled the fraud to continue for years after it should have ended.  GX 1107-08.  He got paid more than any other employee.  Tr. 776.  The traders like Kwang Wook Choi who earned $300-$500 once or twice per month, Tr. 930, were not at the defendant's level.  The defendant was an important component of the ForexNPower scheme, who was irreplaceable in a way that the traders and programmers were not—and he must be held to account for his role in the far-reaching fraud.

It is also important that the sentence afford both specific and general deterrence.  The defendant's lies in this case were truly outrageous and divorced from any grounding in reality.  His business card alone was replete with factual claims the defendant knew to be materially false.  Still, the defendant persisted, for years, stopping only when caught.

The sentence must also provide general deterrence.  The defendant's fraud scheme was easy to perpetrate—a straightforward affinity fraud.  These types of schemes can be difficult to detect and yet extremely harmful to the communities in which they are perpetrated.  Because of the difficulty inherent in investigating crimes within immigrant communities, and prosecuting crimes committed wholly in foreign languages, there is a degree of impunity among fraudsters like the defendant who victimize these easily targeted communities.  When they are caught, a substantial punishment is necessary to ensure that future fraudsters motivated purely by self-interest do not view a similar crime as "a game worth playing."  United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (quotation marks and citation omitted).  Unlike other crimes, white-collar crimes frequently "require[] high sentences to alter that calculus."  Id.; see also United States v. Brown, 880 F.3d 399, 405 (7th Cir. 2018) ("[W]hite-collar criminals 'act rationally, calculating and comparing the risks and rewards before deciding whether to engage in criminal activity.'" (quoting United States v. Warner, 792 F.3d 847, 860-61 (7th Cir. 2015)).

The defendant's culpability in this case is less than his co-defendant's, and his sentence should reflect that lower culpability.  A 24-month sentence—the same given to his co-defendant—would reflect his lower culpability while recognizing that Kang's sentence was reduced because he accepted responsibility for his crimes.

Accordingly, in this case, the sentencing factors set forth in Title 18, United States Code, Section 3553(a), weigh in favor of a sentence of 24 months' imprisonment.  Such a sentence is substantially below the applicable Guidelines range, but it appropriately considers the seriousness of the defendant's offense and will serve to deter both the defendant and other

individuals from similarly engaging in such conduct, while not creating unwarranted discrepancies between co-defendants. See 18 U.S.C. § 3553(a)(2)(A)-(B), (5), (6).

IV. Conclusion

For the foregoing reasons, the government respectfully submits that a sentence of 24 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. The government also respectfully requests that the Court order the defendant to pay restitution in the amount of $835,058.32.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  /s/ Nicholas J. Moscow
Sarah M. Evans
Nicholas J. Moscow
Assistant U.S. Attorneys
(718) 254-7000

Gerald M .Moody
Assistant Chief
United States Department of Justice

cc: Clerk of the Court (RJD) (by ECF)
Defense counsel (by ECF and Email)
Shayna Bryant, United States Probation Officer (by Email)